## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

CATHERINE BECKFORD, individually and
on behalf of all others similarly situated,
                    *Plaintiff*,

v.

Case No.: 25-cv-628

CERNER CORPORATION D/B/A ORACLE
HEALTH INC., and BAPTIST HEALTH SOUTH
FLORIDA, INC.

CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED

                    *Defendants*.

## CLASS ACTION COMPLAINT

Plaintiff, Catherine Beckford, ("Plaintiff") brings this Class Action Complaint against Baptist Health South Florida, Inc. ("Baptist Health") and Cerner Corporation d/b/a Oracle Health, Inc. ("Oracle") (collectively, "Defendants") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to Plaintiff's own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

### PARTIES, JURISDICTION & VENUE

1.      Plaintiff Catherine Beckford is a resident and citizen of Lake Worth, Florida. Lake Worth Beach is located within Palm Beach County. At all relevant times, Plaintiff was a patient of Baptist Health South Florida Inc.

2.      Defendant, Baptist Health South Florida Inc., is a healthcare organization and clinical care network in Miami-Dade, Broward, and Palm Beach counties.

3.      Cerner is a third-party electronic health records vendor that provides electronic health records ("EHR") services to Baptist Health South Florida. It conducts business as Oracle Health Inc.

4. Defendant, Baptist Health South Florida Inc., is a domestic corporation and maintains a principal place of business located at 6855 Red Road, Coral Gables, Florida 33143.

5. Defendant Cerner Corporation, now known as Oracle Health, Inc.,[1] is a Delaware corporation with its principal place of business located at 8779 Hillcrest Road, Kansas City, Missouri 64138. Defendant may be served via its registered agent CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101.

6. Defendant Oracle is a healthcare software-as-a-service (SaaS) company offering electronic health record ("EHR") and business operations systems to hospitals and healthcare organizations.[2]

7. Defendant Oracle is electronic health record (EHR) vendor for Defendant Baptist Health South Florida.

8. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), §1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from each Defendant.

9. This Court has personal jurisdiction over Oracle because its principal place of business is in the District. Oracle has also purposefully availed itself of the laws, rights, and benefits of the State of Missouri.

---

[1] In 2002, Oracle acquired Cerner to form Oracle Health. https://www.oracle.com/health/acquisition-of-cerner-the-future-of-healthcare/

[2] https://www.oracle.com/applications/products/#:~:text=SaaS%20provides%20a%20complete%20software,and%20extend%20your%20applications%20better.

10.     This court has personal jurisdiction over Baptist South Hospital because it contracted with Oracle d/b/a Cerner to store its patient information on their systems which are believed to be located within this District.

11.     Venue is proper under 28 U.S.C §1391 (b) because Defendant Oracle d/b/a/ Cerner maintains a principal place of business in this District and a substantial part of the events- namely the hacking of Oracle d/b/a Cerner's System containing Baptist South Hospital's patient information-occurred in and emanated from the District.

12.     Plaintiff brings this class action against Defendants for its failure to properly secure and safeguard sensitive personally identifiable information ("PII") including, but not limited to: health records, dates of birth, and Social Security Numbers.

13.     On July 25, 2025, Defendant Baptist Health mailed Plaintiff a letter advising her that the Private Information compromised in the Data Breach included certain personal or protected health information of hers. This Private Information included but is not limited to her Social Security number, driver's license number, date of birth, treating physician, dates of service, medication information, insurance information and treatment and/or diagnostic information.[3]

14.     The Private Information was acquired by a third party that gained access to and obtained data that was maintained by Defendant Oracle.[4] In the Breach letter, it was noted that the unauthorized access to Cerner's Systems was discovered in March 2025 and it was believed to have gone back to January 2025.

---

[3] Notice is attached hereto as Exhibit A.
[4] *Id.*

15. Plaintiff and the proposed Class Members provided their Private Information to Defendants as a condition of receiving healthcare treatment. Defendant Oracle stored Plaintiff's and the Class Members' electronic health records on their computer systems and servers.[5]

16. Unfortunately, Defendants failed to take adequate measures to protect its current and former patients' Private Information stored on its computer servers, including failing to implement reasonable cybersecurity safeguards or policies to protect Private Information, and failing to supervise its information technology or data security agents and employees, or vendors, to prevent, detect, and stop breaches of its systems. According to the Data Breach Notification letter, Baptist health advises that their system was not compromised, rather it was a legacy system belonging to Cerner[6].

17. As a direct result of Defendants' failures, on or about January 22, 2025, cybercriminals infiltrated Defendants' systems, gained access to, and copied, the Private Information of Defendants' current and former patients, Plaintiff and the Class Members, including but not limited to their names, Social Security Numbers, and protected health information ("the Data Breach").

18. Although the Data Breach occurred on January 22, 2025, Defendants would not notify impacted patients of the Data Breach until months later, on July 25, 2025.[7]

19. According to Defendants, the Data Breach occurred as a result of Defendants data migration procedures.

20. Ultimately, Defendants directed Data Breach victims to credit reporting agencies to help monitor their credit

---

[5] *Id.*
[6] Exhibit A
[7] *Id*.

21. Omitted from the data breach notice letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff, who retains a vested interest in ensuring that their PII remains protected.

22. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's PII was a known risk to Defendant, and thus, Defendants were on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

23. The Data Breach was a direct result of Defendants' failure to implement an information security program designed to: (a) to ensure the security and confidentiality of customer information; (b) to protect against anticipated threats or hazards to the security or integrity of that information; and (c) to protect against unauthorized access to that information that could result in substantial harm or inconvenience to any customer.

24. An information security program encompasses the administrative, technical, or physical safeguards used to access, collect, distribute, process, protect, store, use, transmit, dispose of, or otherwise handle personal information. Had Defendants implemented an information security program consistent with industry standards and best practices, it could have prevented the Data Breach.

25. As a result of the Data Breach, Plaintiff has suffered an actual injury, similar to an intangible harm remedied at common law. Defendants' failure to implement an information security program resulted in the unauthorized disclosure of Plaintiff's private information to cybercriminals. The unauthorized disclosure of Plaintiff's PII constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendants' failure to adequately secure the PII

in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiff. The injuries Plaintiff suffered, as described herein, can be redressed by a favorable decision in this matter.

26.     Defendants have not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendants have modified its data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

27.     Defendants' conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft, fraud, or other forms of exploitation. The circumstances demonstrating a substantial risk of future identity theft or fraud, include, but are not limited to:

  a. **Sensitive Data Type**: The data acquired in the Data Breach included unencrypted names, social security numbers, and dates of birth. Upon information and belief, this information could be used by cybercriminals to perpetuate fraud.

  b. **Data Breach Type**: A threat actor by the name "Andrew" has claimed responsibility for the cyberattack and is demanding millions of dollars in cryptocurrency from Oracle clients to prevent the leak of the data acquired in the Data Breach.[8]

  c. **Data Misuse**: Upon information and belief, the threat actor named "Andrew" has leaked the data it acquired in the Data Breach on the dark web. The dark web uses a series of encrypted networks to hide users' identities, which makes it convenient for criminals to buy and sell illegally obtained data. Many criminals purchase stolen personal data off the dark web before launching social engineering-based attacks. A social engineering attack is a method of using psychological manipulation to deceive a victim and gain access to a computer system or to steal sensitive information such as login credentials. Social engineering attacks that can be launched using names, telephone numbers and email addresses include phishing, smishing (SMS message), vishing (voice messaging), pretexting, and baiting attacks.

---

[8] https://www.bleepingcomputer.com/news/security/oracle-health-breach-compromises-patient-data-at-us-hospitals/

28.     The imminent risk of future harm resulting from the Data Breach is traceable to the Defendants' failure to adequately secure the PII in its custody, and has created a separate, particularized, and concrete harm to the Plaintiff.

29.     More specifically, the Plaintiff's exposure to the substantial risk of future exploitation caused or will cause them to: (i) spend money on mitigation measures like credit monitoring services and/or dark web searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach. The harm Plaintiff's suffered can be redressed by a favorable decision in this matter.

30.     Armed with the PII acquired in the Data Breach, data thieves have already engaged in theft and can, in the future, commit a variety of crimes including, opening new financial accounts, taking out loans, using Plaintiff's information to obtain government benefits, file fraudulent tax returns, obtain driver's licenses, and give false information to police during an arrest.

31.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [9] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[10]

---

[9] *See*, https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[10] *Id.*

32.     The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[11]

33.     In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[12] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[13]

34.     Note, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

35.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

---

[11] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[12] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited May 29, 2025).
[13] *See* https://www.investopedia.com/terms/s/ssn.asp (last visited May 29, 2025).

the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[14]

36.     For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target his in fraudulent schemes and identity theft attacks.")

37.     Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[15]

---

[14] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited May 29, 2025).
[15] *See* https://oag.ca.gov/idtheft/facts/your-ssn (last visited May 29, 2025).

38.     As a result of the Data Breach, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk their PII will be further misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access on the dark web or otherwise; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the data.

39.     Plaintiff brings this class action lawsuit individually, and on behalf of all those similarly situated, to address Defendants' inadequate data protection practices and for failing to provide timely and adequate notice of the Data Breach.

*40.*     Through this Complaint, Plaintiff seeks to remedy these harms individually, and on behalf of all similarly situated individuals whose PII was accessed during the Data Breach. Plaintiff has a continuing interest in ensuring that personal information is kept confidential and protected from disclosure, and Plaintiff should be entitled to injunctive and other equitable relief.

### *Data Breaches Are Avoidable*

41.     Upon information and belief, the Data Breach was a direct result of Defendants' failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) adhere to its published privacy practices; (iii) implement reasonable data protection measures for the collection, use, disclosure, and storage of personal information; and/or (iv) ensure its third-party vendors were required to implement reasonable data protection measures consistent with Defendants' data protection obligations.

42.     Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's PII was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

43.     Upon information and belief, the Data Breach occurred as the result of a ransomware attack. In a ransomware attack, the attackers use software to encrypt data on a compromised network, rendering it unusable and then demand payment to restore control over the network.[16] Ransomware groups frequently implement a double extortion tactic, "where the cybercriminal posts portions of the data to increase their leverage and force the victim to pay the ransom, and then sells the stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[17]

44.     To detect and prevent cyber-attacks, Defendants could and should have implemented the following measures:

Reasonable Safeguards

a. Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

b. Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

c. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

---

[16] *Ransomware FAQs*, https://www.cisa.gov/stopransomware/ransomware-faqs (last visited May 29, 2025).

[17] *Ransomware: The Data Exfiltration and Double Extortion Trends*, https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends (last visited May 29, 2025).

d. Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

e. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

f. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

g. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

h. Configure firewalls to block access to known malicious IP addresses.

i. Set anti-virus and anti-malware programs to conduct regular scans automatically.

j. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

k. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

l. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

m. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

n. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

o. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

p. Execute operating system environments or specific programs in a virtualized environment.

q. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

r. Conduct an annual penetration test and vulnerability assessment.

s. Secure your backups.[18]

t. Identify the computers or servers where sensitive personal information is stored.

---

[18] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited May 29, 2025).

u. Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

v. Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

w. Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

x. Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

y. Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

z. To detect network breaches when they occur, consider using an intrusion detection system.

aa. Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

bb. Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

cc. Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

dd. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[19]

45. Given that Defendants collected, used, and stored PII, Defendants could and should have identified the risks and potential effects of collecting, maintaining, and sharing personal information.

---

[19] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

46.    Without identifying the potential risks to the personal data in Defendants'
possession, Defendants could not identify and implement the necessary measures to detect and
prevent cyberattacks. The occurrence of the Data Breach indicates that Defendants failed to
adequately implement one or more of the above measures to prevent cyberattacks, resulting in the
Data Breach and the exposure of Plaintiff's and the Class Members' PII.

47.    Defendants knew and understood unencrypted PII is valuable and highly sought
after by cybercriminals seeking to illegally monetize that data. At all relevant times, Defendants
knew, or reasonably should have known, of the importance of safeguarding PII and of the
foreseeable consequences that would occur if a data breach occurred, including the significant cost
that would be imposed on Plaintiff and the Class Members as a result.

### *Plaintiff and Class Members Sustained Damages in the Data Breach*

48.    The invasion of the Plaintiff's and Class Members' privacy suffered in this Data
Breach constitutes an actual, particularized, redressable injury traceable to the Defendants'
conduct. As a consequence of the Data Breach, Plaintiff and Class Members sustained monetary
damages that exceed the sum or value of $5,000,000.00.

49.    Additionally, Plaintiff and Class Members face a substantial risk of future identity
theft, fraud, or other exploitation where their names and social security numbers were targeted by
a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The
substantial risk of future identity theft and fraud created by the Data Breach constitutes a
redressable injury traceable to the Defendants' conduct.

50.    Upon information and belief, a criminal can easily link data acquired in the Data
Breach with information available from other sources to commit a variety of fraud related crimes.
An example of criminals piecing together bits and pieces of data is the development of "Fullz"

packages.[20] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

51.     Given the type of targeted attack in this case, the sophistication of the criminal claiming responsibility for the Data Breach, the type of PII involved in the Data Breach, the hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been placed, or will be placed, on the dark web, it is reasonable for Plaintiff and the Class Members to assume that their PII was obtained by, or released to, criminals intending to utilize the PII for future identity theft-related crimes or exploitation attempts.

52.     The substantial risk of future identity theft, fraud, or other exploitation that Plaintiff and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

53.     For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts

---

[20] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm  (last visited May 29, 2025).

opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[21]

54.     As a consequence of the Data Breach, Plaintiff and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year.

55.     As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

56.     Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[22] Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[23] Sensitive PII can sell for as much as $363 per record.[24]

---

[21]*See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited May 29, 2025).
[22] *Column: Shadowy data brokers make the most of their invisibility cloak*, https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited May 29, 2025).
[23]*In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited May 29, 2025).
[24] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

57.     Furthermore, Defendants' poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. By transacting business with Plaintiff and Class Members, collecting their PII, using their PII for profit or to improve the ability to make profits, and then permitting the unauthorized disclosure of the PII, Plaintiff and Class Members were deprived of the benefit of their bargain.

58.     When agreeing to pay Defendants for products or services, consumers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, Defendants did not invest the funds into implementing reasonable data security practices. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## PLAINTIFF SPECIFIC FACTS

59.     Plaintiff received notice of the Data Breach on, or about, July 25, 2025. *See,* **Exhibit A**. The letter provides a host of actions Plaintiff should take, has taken, or will take in the future to protect herself from future exploitation.

60.     Plaintiff has spent time, and will continue to spend time, reviewing her records and accounts for indicia of fraud. Plaintiff experiences anxiety and stress over the unauthorized disclosure of her Social Security number to cybercriminals and the potential for future exploitation presented by the Data Breach.

61.     Through this Complaint, Plaintiff seeks redress individually, and on behalf of all similarly situated individuals, for the damages that resulted from the Data Breach.

## CLASS ALLEGATIONS

62.     Plaintiff brings this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

63.     The Class that Plaintiff seeks to represent is defined as follows:

**Nationwide Class**: All individuals residing in the United States whose PII was accessed and acquired by an unauthorized party as a result of the Data Breach, as reported by Defendants (the "Class").

**Florida Subclass**
All individuals residing in State of Florida whose PII was accessed and acquired by an unauthorized party as a result of the Data Breach, as reported by Defendants (the "Florida Subclass").

64.     Collectively, the Class and Florida Subclass are referred to as the "Classes" or "Class Members."

65.     Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

66.     Plaintiff reserves the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

67.     <u>Numerosity</u>: The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. While the exact number of Class Members is unknown to Plaintiff at this time and such number is exclusively in the possession of Defendant.

68.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes that predominate over questions which may affect individual Class Members, includes the following:

  a. Whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class Members;

  b. Whether Defendants had a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

  c. Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

  d. Whether Defendants required its third-party vendors to adequately safeguard the PII of Plaintiff and Class Members;

  e. When Defendants actually learned of the Data Breach;

  f. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

  g. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

  h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

  i. Whether Defendants adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

  j. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct;

  k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

69.     Typicality: Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Classes.

70.     Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the

Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendants' conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

71.     Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

72.     Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

73.     The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

74.     The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

75.     Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

76.     Further, Defendants have acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

77.     Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendants failed to timely notify the Plaintiff and the Classes of the Data Breach;

    b. Whether Defendants owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, sharing, storing, and safeguarding their PII;

c. Whether Defendants' security measures to protect its network were reasonable in light of industry best practices;

d. Whether Defendants' (or their vendors') failure to institute adequate data protection measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard consumer PII;

f. Whether Defendants made false representations about their data privacy practices and commitment to the security and confidentiality of customer information; and

g. Whether adherence to industry standards and best practices for protecting personal information would have reasonably prevented the Data Breach.

## **CAUSES OF ACTION**
### (*On behalf of Plaintiff and the Classes*)

### **COUNT 1: NEGLIGENCE/WANTONNESS**

78. Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

79. Defendant Baptist Health is a healthcare provider that stores and transmits health information electronically. Defendant Oracle is an electronic health records ("HER") vendor that performs functions or activities for Defendant Baptist Health that involve the use or disclosure of protected health information.

80. Plaintiff and Class Members were required to entrust Defendants with their PII with the understanding that Defendants would adequately safeguard their information.

81. Defendants had full knowledge of the types of PHI they collected and the types of harm that Plaintiff and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

82. Defendants are regulated by HIPAA and both Defendants must comply with the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health

Information"), 45 C.F.R. Part 160 and Part 164, Subparts A, C, and E. Under these rules, Defendants had a duty to implement reasonable and appropriate safeguards for the protected health information under their control.

83. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires Defendants to provide notification no later than 60 calendar days after the discovery of an unauthorized disclosure of unencrypted protected health information. Defendants had a duty to notify Plaintiff and the Classes of the Data Breach. Such notice was necessary to allow Plaintiff and the Classes to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

84. Defendants' duty included a responsibility to ensure they: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into their information technology and/or cloud environments; (ii) contractually obligated vendors to adhere to certain provision of the HIPAA Rules; (iii) complied with applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits of their data processing activities; (v) regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) provided timely notice to individuals impacted by a data breach.

85. Defendants breached their respective duties by failing to conduct regular privacy assessments and security audits; failing to implement reasonable safeguards; failing to encrypt data; failing to regularly review and modify their security measures to ensure they remain appropriate to protect the character of data involved; failing to timely notify Plaintiff and Class Members of the Data Breach; failing to disable passwords no longer in use; failing to implement multifactor authentication; and/or failing to verify PII was deleted after the EHR contract was terminated.

86. Defendants also had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce, such as failing to adhere to a company's own published privacy policies.

87. Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII that Defendants were no longer required to retain.

88. Defendants had a duty to notify Plaintiff and the Classes of the Data Breach promptly and adequately. Such notice was necessary to allow Plaintiff and the Classes to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

89. .Defendants violated Section 5 of the FTC Act, HIPAA Privacy, Security and/or Breach Notice Rules by failing to adhere to its own privacy policy regarding the confidentiality and security of Plaintiff and Class Members information. Defendants further violated Section 5 of the FTC Act, and other state consumer protection statutes by failing to implement an information security plan or use reasonable security measures to protect PII. Defendants' violations constitutes negligence and/or wantonness.

90. Defendants' failure to adhere to its data privacy and security obligations was a reckless disregard for the Plaintiff's and Class Members' privacy rights. Defendants knew, or should have known, that their failure to take reasonable precautions might result in injury to Plaintiff and Class Members. The negligent and wanton acts or omissions committed by Defendants includes, but is not limited to, the following:

    a. Failing to designate a qualified individual to implement and supervise its information security program.

    b. Failing to conduct an assessment to determine foreseeable risks and threats – internal and external – to the confidentiality, availability, and integrity of protected health information.

c. Failing to design and implement safeguards to control the risks identified through the risk assessment.

d. Failing to encrypt personally identifying information in transit and at rest.

e. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PHI.

f. Failing to adequately monitor the security of their networks and systems.

g. Allowing unauthorized access to PHI.

h. Failing to detect in a timely manner that PHI had been compromised.

i. Failing to delete or destroy PHI it was no longer required to retain.

j. Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

91.     Plaintiff and Class Members are within the class of persons HIPAA and the Federal Trade Commission Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

92.     The injuries resulting to Plaintiff and the Classes because of Defendants' failure to use adequate security measures was reasonably foreseeable.

93.     Plaintiff and the Classes were the foreseeable victims of a data breach. Defendants knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of updating, patching, or fixing critical vulnerabilities in its network.

94.     Plaintiff and the Classes had no ability to protect the PII in Defendants' possession. Defendants were in the best position to protect against the harms suffered by Plaintiff and the Classes as a result of the Data Breach.

95.     But for Defendants' breach of duties owed to Plaintiff and the Classes, their PHI would not have been compromised. There is a close causal connection between Defendants' failure

to implement reasonable security measures to protect the PII of Plaintiff and the Classes and the harm, or risk of imminent harm, suffered by Plaintiff and the Classes.

96.     As a result of the Data Breach, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PII.

97.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

98.     Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate monitoring and protection to all affected by the Data Breach.

## COUNT 2: BREACH OF IMPLIED CONTRACT

99.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

100.    Defendants obtain sensitive PHI from their prospective patients, including Plaintiff and Class Members, in the ordinary course of providing services.

101.    In so doing, Plaintiff and Class Members entered implied contracts with Defendants by which Defendants agreed to use reasonable technical, administrative, and physical safeguards

to protect against unauthorized access to, use of, or disclosure of the personal information it collects and stores.

102. Plaintiff and Class Members would not have entrusted their PHI to Defendants in the absence of an expressed or implied promise to implement reasonable data protection measures.

103. Plaintiff and Class Members fully and adequately performed their obligations under the implied contract with Defendant.

104. Defendants breached the implied contract with Plaintiff and Class Members which arose from the course of conduct between the parties, as well as disclosures on the Defendants' web site, privacy notice, and in other documents, all of which created a reasonable expectation that the personal information Defendants collected would be adequately protected and that the Defendants would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

105. As a direct and proximate result of the Defendants' breach of an implied contract, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PHI; (iii) lost or diminished value of PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PHI.

106. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate monitoring/protection to all affected by the Data Breach.

## COUNT 3: UNJUST ENRICHMENT

107. Plaintiff brings this Count in the alternative to the breach of implied contract count above.

108. By obtaining their PHI, Plaintiff and Class Members conferred a monetary benefit on Defendant. Defendants knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit.

109. By collecting the PHI, Defendants were obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been compromised or stolen.

110. Defendants failed to secure Plaintiff's and Class Members' PHI and, therefore, it would be unjust for Defendants to retain any of the benefits that Plaintiff and Class Members conferred upon Defendants without paying value in return.

111. As a direct and proximate result of the Defendants' conduct, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PHI; (iii) lost or diminished value of PHI; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PHI will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendants' possession or control and is subject to further unauthorized

disclosures so long as Defendants fail to implement appropriate and reasonable measures to protect the PHI.

112. Plaintiff and Class Members are entitled to restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from its wrongful conduct.

## COUNT 4: INVASION OF PRIVACY

113. Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

114. Plaintiff and Class Members had a legitimate expectation of privacy in their sensitive information such as social security numbers. Plaintiff and Class Members were entitled to the protection of this information from disclosure to unauthorized third parties.

115. Defendants owed a duty to Plaintiff and Class Members to keep their PII confidential.

116. Defendants permitted the public disclosure of Plaintiff's and Class Members' PII to unauthorized third parties.

117. The PII that was disclosed without the Plaintiff's and Class Members' authorization was highly sensitive, private, and confidential. The public disclosure of the type of PII at issue here would be highly offensive to a reasonable person of ordinary sensibilities.

118. Defendants permitted its information technology environment to remain vulnerable to foreseeable threats, which created an atmosphere for the Data Breach to occur. Despite knowledge of the substantial risk of harm created by these conditions, Defendants intentionally disregarded the risk, thus permitting the Data Breach to occur.

119.    By permitting the unauthorized disclosure, Defendants acted with reckless disregard for the Plaintiff's and Class Members' privacy, and with knowledge that such disclosure would be highly offensive to a reasonable person. Furthermore, the disclosure of the PII at issue was not newsworthy or of any service to the public interest.

120.    Defendants were aware of the potential of a data breach and failed to adequately safeguard its systems and/or implement appropriate policies and procedures to prevent the unauthorized disclosure of Plaintiff's and Class Members' data.

121.    Defendants acted with such reckless disregard as to the safety of Plaintiff's and Class Members' PII to rise to the level of intentionally allowing the intrusion upon the seclusion, private affairs, or concerns of Plaintiff and Class Members.

122.    Plaintiff and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

## COUNT 5: UNFAIR AND DECEPTIVE TRADE PRACTICES

123.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if fully set forth herein.

124.    Plaintiff and Class Members are employees, applicants, or consumers of Defendants' services. Defendants require its employees, applicants, or consumers, including Plaintiff and Class Members, to submit PHI in the ordinary course of providing products or services.

125.    Defendants gathered and stored the PHI of Plaintiff and Class Members as part of its business. Plaintiff and Class Members entrusted Defendants with their PHI with the understanding that Defendants would adequately safeguard their information.

126.    Under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce. Deceptive practices, as

interpreted by the FTC, include failing to adhere to a company's own published privacy policies. Such behavior by Defendants also constitutes a false, misleading, or deceptive act under state Unfair and Deceptive Trade Practices Act.

127.     Defendants violated the state consumer protection statute by failing to adhere to its own Privacy Policy regarding the confidentiality and security of Plaintiff's and Class Members' information. Defendants further violated the state consumer protection statute by failing to use reasonable measures to protect PHI.

128.     Defendants' conduct created a likelihood of confusion or misunderstanding regarding its actual data privacy and security practices. Defendants promised to protect Plaintiff's and Class Members' PHI via its privacy policies/notices, but allowed the unauthorized access to this personal information; Defendants failed to disclose material facts that the Plaintiff's and Class Members' PHI would be disclosed to unauthorized third parties; Defendants failed to obtain Plaintiff's and Class Members' consent in transmitting their PHI to a third party; and knowingly violated industry and legal standards regarding the protection of Plaintiff's and Class Members' PHI.

129.     Defendants' unfair or deceptive acts affected public interests, including those of Plaintiff and Class Members. Defendants knew or should have known that it was likely to mislead its customers who were acting reasonably. Defendants engaged in unfair or deceptive practices by breaching its duties to provide technical and administrative data security policies, procedures, and practices. Defendants' failure to adhere to its published privacy policies and procedures is offensive to established public policy and is substantially injurious to consumers as evidenced by the massive Data Breach.

130.     Defendants' deceptive acts, as described herein, proximately caused Plaintiff and

Class Members damages.

131.    As a direct and proximate result of the Defendants' conduct, Plaintiff and Class Members suffered damages including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) mitigation costs and expenses; and (v) attorneys' fees and court costs.

132.    Plaintiff alleges that Defendants' data security measures remain inadequate. Plaintiff will continue to suffer injury as a result of the compromise of their PHI and remain at imminent risk that further compromises of their PHI will occur in the future.

133.    Plaintiff and Class Members have suffered irreparable injury and will continue to suffer injury as a result of Defendants' deceptive trade practices, which places Plaintiff and Class Members at imminent risk that further compromises of their PHI will occur in the future. As such, the remedies available at law are inadequate to compensate for that injury. Accordingly, Plaintiff and Class Members also seek to obtain a judgment declaring, among other things, the following:

   a.  Defendants continue to owe a legal duty to secure PHI and to timely notify consumers of a data breach.

   b.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Plaintiff and Class Members' PHI.

134.    The Court also should issue corresponding prospective injunctive relief requiring that Defendants employ adequate data protection practices consistent with law and industry standards.

135.    The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs, Plaintiff will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable

prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

136.    The issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by encouraging Defendants to take necessary action to prevent another data breach, thus eliminating the additional injuries that would result to Plaintiff and the multitude of individuals whose PHI would be at risk of future unauthorized disclosures.

137.    As a result of the Defendants' false, misleading, or deceptive acts, regarding its data security practices, the consuming public in general, Plaintiff, and Class Members suffered injuries including, but not limited to, the future and continued risk their PHI will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains under Defendants' possession or control and is subject to further unauthorized disclosures so long as Defendant fail to implement appropriate and reasonable measures to protect the PII.

138.    Plaintiff and Class Members are entitled to attorneys' fees, costs, and injunctive relief requiring Defendants to: (i) strengthen its data protection procedures; and (ii) to provide adequate monitoring and protection to all affected by the Data Breach.

## COUNT 6: BREACH OF CONFIDENTIALITY

139.    Plaintiff re-alleges and incorporates by reference all the allegations contained in previous paragraphs as if fully set forth herein.

140.    Defendant Baptist Health had an ethical duty to Plaintiff and Class Members because of the physician-patient relationship whereby Defendant became the custodian of Plaintiff and Class Members' confidential data. Plaintiff and Class Members reposed trust and

confidence in Defendant Baptist Health to adequately safeguard the data collected or created during that relationship and to timely notify them of a Data Breach.

141.    Defendant breached its duty to Plaintiff and Class Members by failing to adequately protect against the Data Breach, which revealed confidences entrusted to Defendant by Plaintiff and Class Members during their physician-patient relationship.

142.    Defendant's duties and violations thereof are informed by HIPAA. Defendant Baptist Health breached the duties owed to Plaintiff and Class Members by failing to ensure the confidentiality, integrity, and availability of electronic protected health information ("PHI") Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. §164.306(a)(1).

143.    Upon information and belief, the Data Breach occurred because the threat actor was able to leverage compromised credentials. Therefore, Defendant breached duties owed to Plaintiff and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1).

144.    Defendant breached fiduciary duties owed to Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. §164.308(a)(1).

145.    Defendant breached duties owed to Plaintiff and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. §164.306(a)(2).

146.    Defendant breached duties owed to Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3).

147.    Defendant breached duties owed to Plaintiff and Class Members by failing to ensure compliance with the HIPAA security rules by its workforce in violation of 45 C.F.R. §164.306(a)(4).

148.    Defendant breached duties owed to Plaintiff and Class Members by failing to effectively train all members of its workforce on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5).

149.    Defendant breached duties owed to Plaintiff and Class Members by failing to design, implement, and enforce policies and procedures establishing physical and administrative controls to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

150.    Defendant had a duty to provide notice of the Data Breach no later than 60 calendar days after discovery of the breach in accordance with the provisions of 45 C.F.R. §164.410.

151.    As a direct and proximate result of Defendant's breach of duties, Plaintiff and Class Members have suffered and will suffer injury, as described herein. Accordingly, Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages in an amount to be determined.

152.    Defendant's breaches are ongoing, in that they still hold the PHI of Plaintiff and Class Members in an unsafe and insecure manner.

153. Plaintiff and Class Members are entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; (iii) provide adequate credit monitoring to all Class Members; and (iv) provide complete and accurate information to affected individuals about the Data Breach and the risk patients face.

## COUNT 7: BREACH OF THIRD-PARTY BENEFICIARY AGREEMENT

154. Plaintiff re-alleges and incorporates all paragraphs as if fully set forth herein.

155. Plaintiff and the Class Members are third-party beneficiaries of the contracts between Defendant Baptist Health and Defendant Oracle, under which Oracle received Plaintiff's and Class Member's PII and stored that information on its network.

156. Defendant Baptist Health was required to enter into a business associates' agreement or other contract with Defendant Oracle, which contained the elements specified in 45 C.F.R. §164.504(e). The express terms of these agreements required Defendant Oracle to use appropriate safeguards to prevent the use or disclosure of PHI other than as provided in the contract. Those contract terms were clearly intended to govern the privacy and security of Plaintiff's and the Class Members' PHI. As such, Plaintiff and Class Members were the direct and intended beneficiaries of these contracts.

157. Defendant Oracle breached the foregoing contracts by failing to adequately protect Plaintiff's and Class Members' PHI/PII, and Defendant Baptist Health breached the agreement by failing to audit Defendant Oracle to ensure it safeguarded and/or destroyed Plaintiff's and the Class Member's PHI after the termination of the EHR contract, resulting in the Data Breach and damages.

158.     Defendants knew, or should have known, that breaching the contractual data protection obligations would directly harm Plaintiff and the Class—the intended beneficiaries of those protections. Defendants' conduct constitutes breaches of the covenant of good faith and fair dealing.

159.     As a direct and proximate result of the breach of third-party beneficiary agreement, Plaintiff and Class Members are entitled to actual, compensatory, and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Classes alleged herein, respectfully requests that the Court enter judgment as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff(s) as the representatives for the Classes and counsel for Plaintiff(s) as Class Counsel;

B.     For an order declaring the Defendants' conduct violates the statues and causes of action referenced herein;

C.     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

D.     Ordering Defendants to pay for lifetime credit monitoring and dark web scanning services for Plaintiff and the Classes;

E.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F.     For prejudgment interest on all amounts awarded;

G.     For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendants' conduct;

H.     For injunctive relief as pleaded or as the Court may deem proper; and

I.     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J.     Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

claims in this Complaint and of all issues in this action so triable as of right.

Dated: Wednesday, August 13, 2025.                    Respectfully submitted,

By: */s/ James J. Rosemergy*
**CAREY DANIS & LOWE**
James J. Rosemergy #50166
8235 Forsyth Boulevard, Suite 1100
St Louis, MO 63105
314-725-7700
Fax: 314-721-0905
Email: jrosemergy@careydanis.com

AND

Paul J. Doolittle (*pro hac vice* forthcoming)
**POULIN | WILLEY | ANASTOPOULO**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com
        cmad@poulinwilley.com

*Attorneys for Plaintiff and Proposed Class*